IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DEWEY LINDSEY, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-1649 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| *Commissioner of the Social* | § | |
| *Security Administration*, | § | |
|     Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before United States Magistrate Judge Paul D. Stickney. Dewey Lindsey ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claims for Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"), and Supplemental Security Income ("SSI"), under Title XVI of the Act. The Court has considered Plaintiff's Brief, filed November 18, 2009, Defendant's Brief, filed January 6, 2010, and Plaintiff's Reply Brief, filed January 21, 2010. Having reviewed the evidence of the parties in connection with the pleadings, the Court hereby orders that the Commissioner's decision be **REVERSED** and **REMANDED** for reconsideration consistent with this opinion.

### I. BACKGROUND[1]

*A. Procedural History*

Plaintiff filed applications for DIB (June 28, 2006) and SSI (July 14, 2006), alleging disability since March 1, 2004. (Tr. 117-24.) Both claims were denied initially and upon

---

[1] The following history comes from the transcript of the administrative proceedings, which is designated as "Tr."

reconsideration. (Tr. 64-70; 73-78.) Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 84.)

ALJ Rita R. Carroll presided over Plaintiff's hearing on February 26, 2008 in Dallas, TX. (Tr. 21-57.) Plaintiff appeared at the hearing with counsel and testified. (*Id.*) Thomas R. Irons, Ph.D., appeared and testified as a vocational expert ("VE"). (*Id.*)

The ALJ issued her decision finding Plaintiff "not disabled" on June 11, 2008. (Tr. 9-20.) Plaintiff filed a timely request for review by the Appeals Council, supplemented by additional evidence. (Tr. 8, 455-71.) The Appeals Council denied Plaintiff's request for review on July 13, 2009. (Tr. 1-4.) Plaintiff filed the instant action in the Northern District of Texas on September 3, 2009, seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. § 405(g). (Doc. 1.)

### B. *Factual History*

1. Plaintiff's Age, Education, and Work Experience

Plaintiff's date of birth is September 19, 1956. (Tr. 117.) Plaintiff has a high school education and has completed a 56-hour vocational course in air conditioning. (Tr. 150-51.) Plaintiff's past work includes employment as an auto parts warehouseman and delivery person, cleaner, and telephone customer service representative. (Tr. 18-19, 146.)

2. <u>Medical Evidence</u>

Plaintiff alleges both physical and mental impairments. A chemistry profile conducted by Baylor Medical Center on October 12, 2007 reports that Plaintiff's creatinine and AST/ALT levels were higher than the normal range. (Tr. 382.) The profile also found Plaintiff's CPK level to be 16 times the upper limit of the normal range. (*Id.*) Plaintiff also tested for abnormally high ALT levels on at least seven other dates throughout 2005, 2006, and 2007. (Tr. 345, 346, 347,

349, 350, 410.) Plaintiff suggests that these test results signify kidney and liver damage caused by scleroderma and Hepatitis A. (Tr. 36, 354.)

Plaintiff also suffers from chronic post-encephalitis headaches. (Tr. 35, 290, 293, 320, 309-11, 313, 344, 367.) A CT scan of Plaintiff's head taken by Baylor Medical Center on October 12, 2007 revealed an "abnormal[ly] low density of the subcortical white matter in the right temporoparietal region which is consistent with the patient's clinical history of previous herpes encephalitis." (Tr. 379.) Plaintiff was discharged from Baylor Medical Center with a diagnosis of seizure disorder and ordered not to drive. (Tr. 372.)

Plaintiff has likewise displayed a history of mental impairments. He has sought treatment in connection with mental health issues at the ADAPT Institute of Texas ("ADAPT") since early 2003. (Tr. 295-96, 344, 354.) On April 29, 2003, Donna Greenman, RN, PMHNP, diagnosed Plaintiff with major depressive disorder, recurrent. (Tr. 344.) This diagnosis remained constant throughout 2003. (Tr. 337-43.) Dr. John D. Bennett, M.D., also signed each of Ms. Greenman's reports. (*Id.*) Ms. Greenman met with Plaintiff six times in 2004 and assigned him global assessment of functioning ("GAF") scores between 45-48 at each evaluation.[2] (Tr. 320, 324, 326, 328, 330, 331.)

On July 12, 2005, Plaintiff returned to ADAPT on July 12, 2005, for evaluation. (Tr. 224-26, 242.) As explanation for his eight-month absence, Plaintiff reported having been arrested for possession of cocaine followed by 180 days of incarceration. (Tr. 242.) He informed Ms. Greenman that he had been suffering from mood swings, low energy, racing thoughts, and insomnia. (Tr. 242.) Ms. Greenman diagnosed Plaintiff with major depressive disorder, ruling

---

[2] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* [34] (4th ed. Text rev. 2000) (DSM). A GAF score of 41-50 indicates serious symptoms and/or a serious impairment in social, occupational, or school functioning. *See id.*

out bipolar disorder and noting that Plaintiff's cocaine dependence was in remission. (*Id.*) Plaintiff met with Ms. Greenman three more times in 2005 and eight times in 2006. (Tr. 227, 229-30, 233, 235, 238-39, 310-11, 313, 315.) By June 30, 2006, Ms. Greenman had diagnosed Plaintiff with bipolar disorder, changing her prior diagnosis. (Tr. 227.) Plaintiff reported suffering nausea as a side effect of his medication. (Tr. 310-11, 315.)

Consultative examiner Katherine S. Donaldson evaluated Plaintiff on August 22, 2006. (Tr. 246-49.) In her report, Dr. Donaldson noted that although Plaintiff did not endorse symptoms indicative of bipolar disorder, it was possible that such symptoms had been effectively managed by medication at that time. (Tr. 249.) In reaching her opinion, Dr. Donaldson also noted that Plaintiff denied ever experiencing inflated self-esteem, that he did not have a decreased need for sleep, and that he had not had an increase in goal-directed activity. (Tr. 246.) In addition, Dr. Donaldson suspected that drug use was a source of Plaintiff's troubles, remarking that "[Plaintiff] appeared to be a reliable historian, except when it came to reporting on his history of drug and alcohol use, which may have been underreported." (*Id.*) Further, Dr. Donaldson recorded that "[Plaintiff] admitted to having difficulty holding a job due to his cocaine and alcohol abuse." (Tr. 247.) However, she diagnosed Plaintiff's polysubstance dependence as "sustained full remission." (Tr. 249.) Dr. Donaldson assigned Plaintiff a GAF score of 55.[3] (*Id.*)

On September 14, 2006, Mehdi Sharifian, M.D., completed a psychiatric review form. (Tr. 254-63.) Dr. Sharifian, a non-examining physician, ruled out bipolar disorder, citing major depressive disorder and polysubstance dependence as Plaintiff's primary impairments. (Tr. 253, 258.) Dr. Sharifian also completed a mental Residual Functional Capacity ("RFC") assessment of Plaintiff, finding that Plaintiff was moderately limited in tasks such as "the ability to

---

[3] A GAF score of 51-60 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *See* DSM [34].

4

understand and remember detailed instructions," "the ability to respond appropriately to changes in the work setting," and "the ability to complete a normal work-week without interruptions from psychologically based symptoms." (Tr. 264.)

In 2007, Plaintiff presented to Ms. Greenman at ADAPT for evaluation on six occasions. (Tr. 308, 411-12, 418, 432, 441-42, 470-71.) Ms. Greenman diagnosed Plaintiff with bipolar disorder at each session and reported his ongoing issues with nausea and/or dizziness as side effects of his medication. (Tr. 308, 412, 471.) Plaintiff also met with Erin Lucas, QMHP-CS, on a weekly basis. (Tr. 298-305, 425, 435-40, 443-54.) Additionally, Dr. Bennett completed a mental impairment questionnaire for major depressive and bipolar disorders on July 6, 2007. (Tr. 354-59.) Dr. Bennett assigned Plaintiff a GAF of 45. (Tr. 354.) He also diagnosed Plaintiff with affective/bipolar disorder, noting that Plaintiff exhibited most of the depressive and manic characteristics necessary for that diagnosis. (Tr. 354-55.) Dr. Bennett reported that Plaintiff suffered nausea, tremors, dizziness, and sedation as side effects of his medication and that symptoms of his mental disorder included racing thoughts, mood swings, insomnia, and difficulty retaining instructions given. (Tr. 354.) Dr. Bennett's prognosis was that "[Plaintiff] will continue to have symptom exacerbations of his illness periodically." (*Id*.) When directed to answer questions concerning Plaintiff's functional limitations and abilities to complete work-related activities, Dr. Bennett expressed his opinion that Plaintiff had marked difficulties in maintaining social functioning and in maintaining concentration. (Tr. 356.) Dr. Bennett also noted that Plaintiff was seriously limited in working with co-workers, dealing with normal work stress, and maintaining regular attendance. (Tr. 357-58.) These factors would likely render him unable to complete a normal work-week without interruptions from psychologically-based

symptoms. (*Id.*) Finally, Dr. Bennett noted that he did not believe that drugs or alcohol were contributing factors to Plaintiff's impairment. (Tr. 359.)

Records submitted to the Appeals Council reflect that Plaintiff presented to ADAPT four times in 2008 and also in April 2009. (Tr. 456, 459, 461, 463, 470.) Ms. Greenman reported that Plaintiff was "unkempt, unshaven" on all of these occasions. (*Id.*) Moreover, Ms. Greenman continued to diagnose Plaintiff with bipolar disorder and report his ongoing problems with insomnia, mood swings, and racing thoughts. (*Id.*) Plaintiff's GAF scores were 45 and 42 on May 6, 2008 and July 29, 2008, respectively. (Tr. 462, 466.)

3. Plaintiff's Hearing

Plaintiff was represented by counsel at his February 26, 2008 hearing. (Tr. 23.) After the ALJ admitted the exhibits into the record, the ALJ examined Plaintiff. (Tr. 26.) Plaintiff revealed that his sole criminal conviction had been for possession of cocaine in 2005, and he had served six months in the county jail. (Tr. 28.) However, Plaintiff stated that he had been absolutely clean of drug and/or alcohol use since that event. (Tr. 37.) Plaintiff reported that he had attended Narcotic Anonymous/Alcoholics Anonymous and group meetings at ADAPT following his release and had volunteered at the Salvation Army as a means of interacting with people "living the sober life." (Tr. 37.)

The ALJ next questioned Plaintiff about his prior work history. (Tr. 28-35.) Plaintiff stated that he had tried to work some after March 1, 2004, his alleged onset date of disability. (Tr. 28.) His last job was a position as a bell-ringer for the Salvation Army in 2005 and 2006. (Tr. 28-29.) Plaintiff also worked part-time for the Salvation Army as a building maintenance worker in 2005. (Tr. 31-33.) Plaintiff stated that he thought it was possible that he could have worked 40 hours per week in a similar capacity for the Salvation Army if such a position had been made

available at the time. (Tr. 33.) He clarified, however, that he did not think he could handle such a position in his current condition. (Tr. 38.) In 2006, Plaintiff tried to work as an assembly-line packer for a plastics manufacturer but was released after two days because he could not keep up with the work. (Tr. 34, 37-38.)

The ALJ also questioned Plaintiff about his medical history. (Tr. 35.) Plaintiff stated that he has had several problems over the years, including scleroderma, hepatitis, and encephalitis, which has caused him severe headaches. (*Id.*) Plaintiff has not treated his scleroderma condition because he was told at the time of diagnosis that there was no treatment available. (*Id.*) Plaintiff stated that he was led to believe that the average life expectancy after diagnosis was five years, so he lived "like that." (Tr. 36.) However, in spite of Plaintiff's prognosis and lack of treatment, he has lived more than twenty years since his diagnosis. (*Id.*) Plaintiff also suffers from liver damage, but he is unsure whether it is a direct symptom of his scleroderma. (*Id.*) Additionally, he has been diagnosed with a seizure disorder. (Tr. 40-41.) Plaintiff stated that he blacked out while playing cards on his computer and woke up on the floor. (Tr. 41.) Plaintiff believes that he tore his groin muscle over the course of this incident, and he has been having trouble walking ever since. (Tr. 42.)

Plaintiff reported that his current medications include Remeron, Vistaril, Propranolol, Lamictal, and Dilantin. (Tr. 38.) Plaintiff noted that although his medications help his mood and anxiety to a point, he still encounters racing thoughts and feelings of worthlessness. (Tr. 39, 44.) In addition, Plaintiff's medications saddle him with several side effects, including nausea and dizziness. (Tr. 38-39.) The medications also disrupt Plaintiff's sleep cycle, frequently resulting in drowsiness in the daytime and an inability to sleep at night. (Tr. 39.) Plaintiff testified that he can no longer work due to the combination of these side effects. (Tr. 44.) Plaintiff reported that

7

he does not leave bed as often as two or three days a week because of anger issues and an inability to cope with others. (*Id.*) When asked if he could handle a full-time job requiring attendance five days a week, Plaintiff said that he could not. (Tr. 46.) He admitted that even when he had worked part-time, he missed work from time to time. (*Id.*) Plaintiff also admitted that he walked off a job in 2004 because he was unable to get along with other people. (Tr. 47.)

The second and final witness was the VE. (Tr. 47-57.) The VE testified that Plaintiff's past relevant work includes a position as a customer service representative (sedentary, skilled, SVP of 5). (Tr. 49.) Plaintiff's past relevant work also includes a job as an auto parts delivery driver (medium, semiskilled, SVP of 3) and warehouseman (medium, unskilled, SVP of 2). (Tr. 49-50.) Finally, Plaintiff worked at the Salvation Army as a maintenance worker/cleaner (medium, unskilled, SVP of 2). (Tr. 50.) The VE then testified that a person with the residual functional capacity ("RFC") to lift or carry fifty pounds occasionally and twenty-five pounds frequently, who must (1) have only incidental interaction with coworkers and the public and (2) keep away from unprotected heights, ropes, ladders, or dangerous machinery, would not be able to perform Plaintiff's past relevant work. (Tr. 51.) However, the VE stated that a person with the same RFC and Plaintiff's same background could perform other work. (Tr. 52.) One example provided was a hand-packager (1,100 jobs available in Texas, 17,000 nationally). (*Id.*) However, the VE admitted that this is an assembly-line job, and Plaintiff would be subject to the same types of pressures that were problematic in his attempt at working an assembly-line job in 2006. (*Id.*) Other examples of possible careers were hospital cleaner (12,800 in Texas, 147,600 nationally), housekeeper (12,400 in Texas, 147,000 nationally), and photocopy machine operator (900 in Texas, 12,700 nationally). (Tr. 53.) The VE noted that Plaintiff could not sustain competitive employment in these positions if he could not get to work four or five days a month. (*Id.*)

Plaintiff's attorney then examined the VE. (Tr. 53-57.) The VE testified that a person identical to Plaintiff in all respects would not be able to maintain productive work if that person was "moderately limited in their ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 54-55.) The VE was then asked whether a person identical to Plaintiff in all respects would be able to maintain competitive employment at all if the person was (1) unable to meet competitive standards in the ability to complete a normal work day or work week without interruptions from psychologically based symptoms and (2) seriously limited but not precluded in one's ability to maintain regular attendance and be punctual, work in coordination or proximity to others, perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers of peers without being distracted by them, deal with normal work stress, or travel in unfamiliar places. (Tr. 56.) The VE stated that a person who suffered from these limitations at least 60% of the time could not work. (Tr. 57.)

### A. *ALJ's Findings*

First, the ALJ found that Plaintiff met the insured status requirements of the Act through June 30, 2010. (Tr. 14.) Second, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 1, 2004, the Plaintiff's alleged disability onset date. (*Id.*) Third, the ALJ found that Plaintiff has the severe impairments of seizure disorder, affective disorder, and polysubstance abuse disorder. (*Id*.) Fourth, the ALJ found that Plaintiff's impairments, considered individually or in combination, do not meet or medically equal one of the listed impairments in Appendix 1 of the Regulations. (Tr. 15.) Fifth, the ALJ found that Plaintiff has the RFC to lift, carry, push, or pull twenty-five pounds frequently and fifty pounds occasionally,

to stand and/or walk six hours in an eight-hour workday, and to sit six hours in an eight-hour workday. (Tr. 16.) The ALJ also included that Plaintiff must not climb, work at heights, or work with dangerous machinery and that Plaintiff is limited to only incidental interaction with the public and/or co-workers. (*Id*.) In making her RFC determination, the ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to produce the alleged symptoms but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible. (Tr. 17.) The ALJ noted that Plaintiff's months of sporadic treatment compliance and drug/alcohol abuse were significant factors in her decision. (*Id.*) Additionally, the ALJ gave "no significant weight" to the opinion of Dr. Bennett because of inconsistencies. (Tr. 18.) Sixth, the ALJ found that Plaintiff is unable to perform any past relevant work. (*Id*.) Seventh, the ALJ found that Plaintiff was 47 years old on his alleged date of disability onset, has a high school education, and is able to communicate in English. (Tr. 19.) Eighth, the ALJ found that transferability of job skills is not an issue. (*Id*.) Ninth, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are a significant number of jobs in the national economy that he could perform. (*Id*.) Finally, the ALJ found that the claimant was not disabled, as defined by the Act, since March 1, 2004. (Tr. 20.)

## II. ANALYSIS

### A. *Standard of Review*

A claimant must prove that he is disabled for purposes of the Act to be entitled to Social Security Benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the Regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at Step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be shifted either by reference to the Medical-Vocational Guidelines of the Regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny

benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236, 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

Having reviewed the applicable legal standards, the Court turns to the merits of the case.

### A. *Issues for Review*

Plaintiff contends that: (1) the ALJ erred by conducting improper analyses of Plaintiff's alleged noncompliance with prescribed treatment and substance abuse; (2) substantial evidence does not support the ALJ's RFC determination; and (3) the ALJ gave improper weight to treating and examining source opinions. In addition, Plaintiff contends that the Appeals Council's decision to deny Plaintiff's request for review was improper because it lacked adequate specificity, resulting in prejudice against Plaintiff.

### B. *Noncompliance with Treatment and Substance Abuse*

As an initial matter, the Court must determine whether certain Social Security Rulings and Regulations apply to this case. In some cases, a finding of noncompliance with treatment or of substance abuse precludes a finding of disability. *See* 20 C.F.R. § 404.1530 ("If you do not follow the prescribed treatment without good reason, we will not find you disabled"); SSR 82-59, 1982 WL 31384, at *1 ("Individuals with a disabling impairment which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability"); 20 C.F.R. §§ 404.1535, 416.935 (providing that if

there is medical evidence of the claimant's substance use, the Commissioner must determine whether the claimant would still be disabled in the absence of substance use). However, the ALJ must follow various requirements before making a finding of noncompliance or substance abuse. *See* SSR 82-59; 20 C.F.R. §§ 404.1535, 416.935. Plaintiff claims that the ALJ erred by failing to adhere to the Rulings and Regulations when assessing the effects of Plaintiff's alleged noncompliance and substance use on her RFC determination. (Pl. Br. 1, 9; Tr. 17-18.) The Commissioner contends that these requirements only apply if the ALJ finds noncompliance or substance abuse after finding disability at Step 5.

Even though the ALJ did not determine noncompliance or substance abuse after finding Plaintiff disabled at Step 5, the ALJ relied almost exclusively on substance abuse and noncompliance with prescribed treatment to determine Plaintiff's RFC, which provided the basis for the decision that Plaintiff was not disabled. Therefore, the Court finds that the ALJ relied on noncompliance and substance abuse as the basis for finding Plaintiff not disabled. *See Ibarra v. Commissioner*, 92 F. Supp. 2d 1084, 1087 (D. Or. 2000) ("The ALJ did not expressly purport to deny claimant benefits on the ground that she failed to follow prescribed treatment … but his comments … and his ultimate finding that claimant is not disabled, rest[ed], in significant part, on his expressed perception that her failure to follow a prescribed treatment caused her [bipolar] condition to be worse than it might otherwise be."); *see also Beckett v. Astrue*, No. 3-09-CV-1058-BD, 2010 U.S. Dist. LEXIS 126918, at *7 (N.D. Tex. Dec. 1, 2010) (finding that 20 C.F.R. § 404.1535 applies when an ALJ considers substance abuse in a claimant's RFC determination); *Alexander v. Astrue*, No. 07-477, 2008 U.S. Dist. LEXIS 25989, at *15 (W.D. La. March 31, 2008). The ALJ states that "with treatment compliance, the claimant would not have been precluded from working," "with treatment compliance and sobriety, the claimant would be able

to meet the demands of competitive work," and "with medication compliance and sobriety, the claimant has experienced at most moderate functional limitations . . . [and] could perform the demands of simple work." (Tr. 17-18.) Furthermore, the ALJ cited Dr. Bennet's lack of consideration of substance abuse and noncompliance as a reason for discrediting the treating physician's testimony. (Tr. 18.) The Court concludes that the ALJ cannot circumvent the requirements of SSR 82-59 and §§ 404.1535 and 416.935 by couching her analysis of substance use and noncompliance in terms of an RFC determination. Therefore, the principles contained in SSR 82-59 and §§ 404.1535 and 416.935 apply.

The ALJ did not follow the requirements of SSR 82-59[4] and §§ 404.1535 and 416.935.[5] The Court concludes that failure to follow these procedural safeguards resulted in prejudice to Plaintiff. The Court suspects that proper consideration of the rules and regulations would have resulted in a different RFC because, as analyzed below, substantial evidence does not support a finding of noncompliance or substance abuse.

Noncompliance

The ALJ provided only a few examples where Plaintiff is noted to have missed appointments or not taken his medication. (Tr. 17; 230; 233; 331; 320.) However, the medical record, at over 250 pages, is vast and documents Plaintiff's treatment on a regular and continuous basis. Furthermore, Plaintiff's failure to attend *all* of his scheduled appointments and to take his medicines correctly may be consistent with the functional and mental abilities that his treating physician has noted are limited or problematic areas for Plaintiff. (Tr. 355-57.) Courts have held

---

[4] Before making a finding of noncompliance, the ALJ must provide the claimant with (i) notice of the effect of noncompliance on his application for benefits, (ii) occasion to explain any seeming noncompliance, and (iii) opportunity to undergo the prescribed treatment. SSR 82-59. If the ALJ fails to provide the claimant with an opportunity to address the issue, he loses the ability to assert it as a reason for denying disability benefits. *Id.*

[5] These regulations provide, "In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling." 20 C.F.R. §§ 404.1535, 416.935.

that a mentally ill person's noncompliance with treatment can be, and usually is, "the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009); *see also Burns v. Astrue*, No. 5:07-CV-182-BG, 2008 U.S. Dist. LEXIS 112986, at *14 (N.D. Tex. May 2, 2008) ("it is not clear whether Burns' non-compliance was the result of a rational choice or whether it was caused by the psychotic symptoms of her mental illness. The ALJ should therefore develop the issue further on remand."); *Grossweiler v. Barnhart*, No. SA-02-CA-903-RF, 2003 U.S. Dist. LEXIS 19137, at *13 (W.D. Tex. Sept. 30, 2003) ("on remand, the ALJ is to consider, based on competent medical evidence, whether a patient with schizoaffective or bipolar illness, whose symptoms are relatively stable on medications, can nevertheless have delusional symptoms or enter a manic phase, and whether those symptoms can then induce him to discontinue medications which he knows, when he is rational, he could continue taking."). Because Plaintiff's inability to comply perfectly with prescribed treatment is arguably consistent with the impairments and symptoms Plaintiff alleges keep him from obtaining gainful employment, this Court suspects that Plaintiff's noncompliance may be justified for an acceptable "good reason" that the ALJ should have considered in her decision. *See* 20 C.F.R. § 404.1530; SSR 82-59.

Defendant cites *Villa v. Sullivan* to support its argument that noncompliance was properly considered as a material factor in the ALJ's RFC determination. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). However, the present case is distinguishable from *Villa*. The plaintiff in *Villa* relied primarily on his own testimony to establish that he would be disabled with or without regular treatment. *Id*. Further, the court in *Villa* determined that the plaintiff took no medication at all for the relief of his alleged severe pain, nor could he provide evidence that he had sought treatment for his impairment. *Id*. In this case, however, Plaintiff has provided a great

deal of evidence in regard to his medical history. Above all, Plaintiff's long history of attending ADAPT for treatment is well-documented, and his extensive history of GAF scores of 50 or below is particularly consistent. (Tr. 225, 227, 229, 238-39, 242, 282, 290, 293-94, 309, 320, 324, 326, 328, 330, 331, 337-38, 342-44, 354, 413, 420, 432, 434, 442, 453, 462, 464, 466.) The record shows that Plaintiff has displayed considerable determination in seeking medical care regularly. (Tr. 298-305, 425, 435-40, 443-54.)

When considered in light of the record as a whole, the examples of Plaintiff's noncompliance are few and inconclusive. Furthermore, the evidence suggests Plaintiff may have good reason for failing to comply with treatment perfectly. The Court finds that substantial evidence does not support the ALJ's determination of noncompliance and that, therefore, the ALJ improperly considered noncompliance in the RFC determination.

Substance Abuse

The record contains few references to Plaintiff's substance use beyond the six-month sentence he served for possession of cocaine in 2005. (Tr. 28.) The ALJ cited only two places where the record mentions Plaintiff's substance use. (Tr. 17, 246-49, 331.) First, the ALJ cited a February 2004 report, which states that Plaintiff had consumed "a few drinks over the last two months." (Tr. 331.) Second, the ALJ cited Dr. Donaldson's examining opinion, in which Dr. Donaldson remarked that Plaintiff was a reliable historian "except when it came to reporting on his history of drug and alcohol use, which may have been underreported." (Tr. 246.) Dr. Donaldson also noted that "[Plaintiff] admitted to having difficulty holding a job due to his cocaine and alcohol abuse." (*Id.*) However, the report is unclear as to whether this statement is meant to apply to Plaintiff's short-term status or Plaintiff's entire lifelong job history, and Dr. Donaldson goes on to diagnose Plaintiff with polysubstance dependence, *sustained full*

*remission*, indicating that Plaintiff was not abusing drugs at that time. (Tr. 249 (emphasis added).) Furthermore, Dr. Donaldson failed to provide any recent or specific examples of Plaintiff's substance abuse or any reason to suspect Plaintiff was "underreporting" his drug and alcohol use. *Id.*

Moreover, there is much evidence to support a finding that Plaintiff's symptoms would be identical in the complete absence of substance abuse, in which case it cannot be considered a material factor. *See* 20 C.F.R. §§ 404.1535, 416.935; *Brown v. Apfel*, 192 F.3d 492, 498-99 (5th Cir. 1999); *Cravin v. Astrue*, No. 5:07-CV-222-BG, 2008 U.S. Dist. LEXIS 112511 at *7 (N.D. Tex. July 1, 2008). There are numerous examples within the record that detail Plaintiff's mental and physical impairments in the absence of substance use. *See* 20 C.F.R. § 404.1535(b). Plaintiff's physical impairments, such as headaches and medicinal side effects, have been constant factors before and after his substance use was in remission. (Tr. 239, 274, 277, 309-10, 324, 326, 344.) Likewise, Plaintiff was assigned GAF scores between 40 and 50 every time he was tested at ADAPT between July 2003 and July 2008. (Tr. 227, 229, 235, 238-39, 309, 432, 442, 462.) Here, the ALJ's does not discuss any differences in Plaintiff's symptoms and limitations before and after Plaintiff entered remission.

The Court finds that the ALJ's decision to use Plaintiff's history of substance use as a material contributing factor in her RFC determination was not supported by substantial evidence. Therefore, the instant case should be remanded so that the ALJ may reconsider Plaintiff's RFC determination in light of the foregoing analysis.

### III. CONCLUSION

Because the Court finds that the case should be remanded based on the foregoing analysis, it does not reach the remainder of Plaintiff's arguments. The Court orders that the final decision of

the ALJ be **REVERSED** and **REMANDED** for further administrative proceedings consistent with this opinion.

SO ORDERED, March 9, 2011.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE